VAN SLOOTEN v LARSEN

BICKEL v FAIRCHILD

Docket Nos. 62256, 61917. Argued October 3, 1979 (Calendar Nos. 7, 8).—Decided December 23, 1980.

The constitutionality of the statute terminating certain dormant oil and gas interests in real property as applied to interests created before its enactment is challenged in these cases.

H. John Van Slooten, the successor in grant of 40 acres of land in Kalkaska County, which was conveyed to the grantee by Nellie Gill in 1943 by a deed which reserved all oil, gas, and mineral rights in the property, brought an action to quiet title to the oil and gas interests against Myrtle Larsen, Ruth Armstrong, and other heirs of Nellie Gill. The deed was recorded on August 7, 1945. In 1970 one of the Gill heirs recorded an oil and gas lease for a share of the property, which was the first recorded instrument asserting the oil and gas rights reserved by the Gill deed, and the other heirs executed similar leases. No drilling permits were issued in the 20 years following the recording of the Gill deed. The Kalkaska Circuit Court, William R. Peterson, J., decided that in this case the operation of the dormant interest act violated the Due Process Clause and that it unconstitutionally impaired the obligation of contract, and the circuit court granted judgment for the defendants. The Court of Ap-

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 10-12, 20-28] 16A Am Jur 2d, Constitutional Law § 694 et seq.
[3, 4, 11, 12] 16A Am Jur 2d, Constitutional Law § 812 et seq.
[5]16A Am Jur 2d, Constitutional Law § 397 et seq.
[6, 17, 18] 16 Am Jur 2d, Constitutional Law § 219 et seq.
    16A Am Jur 2d, Constitutional Law §§ 851, 852.
[7-9, 12, 25]16A Am Jur 2d, Constitutional Law § 416 et seq.
[9] 16A Am Jur 2d, Constitutional Law § 816 et seq.
[13] 1 Am Jur 2d, Abandoned, Lost, and Unclaimed Property §§ 15-17.
[14, 16] 1 Am Jur 2d, Abandoned, Lost, and Unclaimed Property §§ 15, 36, 39.
[15, 16] 16A Am Jur 2d, Constitutional Law §§ 818, 851.
[17, 18] 1 Am Jur 2d, Abandoned, Lost, and Unclaimed Property § 34.
[19] 16A Am Jur 2d, Constitutional Law § 747.

peals, N. J. Kaufman, P.J., and D. E. Holbrook, Jr., and D. F. Walsh, JJ., reversed on the grounds that the dormant interest act is a valid exercise of the police power to encourage exploration for and extraction of oil and gas, and that the statute does not prevent the defendants from enforcing a contract but only requires them to indicate their continuing interest in the oil and gas rights by taking certain actions (Docket No. 77-1991). Defendants appeal.

John and Etta Mae Bickel and their lessees, who claimed oil and gas rights in 160 acres of land the Bickels owned in Montmorency County, brought an action to quiet title to the oil and gas interests against James and Winifred E. Fairchild, Carl and Doris Worth, and their lessees, who were successors to the owners of mineral rights reserved by previous conveyances of the land. Isabell Worth had conveyed the land to James I. Fairchild and Grace Fairchild in 1944, reserving all oil, gas, and mineral rights. In 1971 James and Winifred E. Fairchild conveyed the land to the Bickels, again with a reservation of the mineral rights. In 1973 Carl and Doris Worth, claiming as successors to Isabell Worth's reservation of the mineral rights in 1944, granted an oil and gas lease to the Shell Oil Company. In the following year the Fairchilds granted an oil and gas lease to Delores Cook. The Bickels granted an oil and gas lease to Getty Oil Company, Skelly Oil Company, Total Leonard, Inc., and The Dow Chemical Company. Getty Oil and Skelly Oil then assigned part of their interest to Saxon Oil Company. The Montmorency Circuit Court, Joseph P. Swallow, J., granted summary judgment for the defendant Shell Oil Company, the lessee of the Worths, on the ground that it was unconstitutional to deprive defendants Shell and Worth of their oil and gas rights by operation of the statute. The Court of Appeals, V. J. Brennan, P.J., affirmed on the ground that the application of the statute was an unconstitutional impairment of the obligation of contract (Docket No. 77-1225). Plaintiffs appeal.

In an opinion by Chief Justice Coleman, joined by Justices Fitzgerald, Ryan, and Moody, the Supreme Court *held:*

1. The defendants contend that the dormant interest act unconstitutionally impairs the obligation of contract. When adjudicating such a claim, the first inquiry should be whether the statute has, in fact, operated as a substantial impairment of the contractual relation. The severity of the impairment determines the height of the hurdle the act must clear. In these cases, although the consequences of failing to perform one of the specified acts or to record a claim of interest every 20 years may be severe, the obligation to record is so minimal an

impairment that the presumption of the constitutionality of the statute is not overcome. It cannot be seriously contended that the defendants were substantially induced to enter into these relationships in reliance on the fact that their interests need not be recorded, or recorded more than once, or that such a requirement significantly changed their bargaining position. Recording statutes have been upheld in the face of constitutional challenges on impairment grounds. The requirement of periodic recording furthers valid state interests. The statute, as applied in these cases, does not unconstitutionally impair the obligation of contract.

2. Statutes which require property owners in possession to institute a proceeding within a specified time or lose their property have been held unconstitutional because a state cannot require one in possession of all that he demands to prosecute a suit to preserve his interest when no adverse interest is asserted by suit or possession. However, the dormant interest act specifically exempts from its abandonment provisions those oil and gas interests which have been occupied as specified in the act at any time within the last 20 years. More importantly, the act does not require the owner to institute a suit to preserve title to the severed interest; it requires only that the owner record a notice of his claim every 20 years. Statutes imposing recording requirements have been upheld when a reasonable time is provided for recording existing interests. The act does not unconstitutionally change the defendants' property rights into mere causes of action.

3. The dormant interest act, however, does convert a corporeal hereditament, which at common law could not be abandoned, into an interest which is subject to abandonment. Whether this change constitutes a deprivation of property without due process of law depends on whether it was a proper exercise of the state's police power. The defendants carry the burden of overcoming the presumption of constitutionality of the statute and must prove either that no public purpose is served by the act or that no reasonable relationship exists between the remedy adopted and the public purpose sought to be achieved. Because the presumption of constitutionality favors validity, if the relationship between the statute and the public purpose is debatable the legislative judgment must be accepted. The clear purpose of the act is to facilitate the development of oil and gas resources, the importance of which was recognized long before the current energy crisis. The argument that encouraging the development of oil and gas resources is not a valid public purpose is not persuasive. The

primary purpose of the act is not to vest title to the severed mineral interests in the owner of the surface property but to facilitate development of the subsurface property by reducing the problems of fragmented and unknown ownership of oil and gas rights. It improves the marketability of severed interests and thereby increases the development of fossil fuels, the revenues from property taxes, and employment with its related benefits. The defendants have not demonstrated that the act is unconstitutional because of the absence of a valid public purpose.

4. A reasonable relationship exists between the remedy adopted and the public purpose sought to be achieved by the act. The commercial nature of, and the common-law rules relating to, severed mineral interests have created significant problems for one attempting to secure title to, or permission to develop, a severed mineral interest. The title to the severed mineral estate tends to become fractionalized over time, which increases the likelihood that a potential developer will not be able to locate the owners of the interest in order to begin development. Without a recording requirement, the task of locating the necessary owners may be impossible or prohibitively expensive. The alternative of attempting to develop the mineral interest without the owner's consent is not attractive. The requirement of doing certain acts to indicate ownership or recording a claim every 20 years places no undue burden upon owners of the severed interests. Without such a requirement, knowledge of the ownership could be lost in time, and resources could go undeveloped.

5. The Supreme Court of the United States has held constitutional a statutory requirement of recording of an existing property interest as a condition to preserving title to the interest although no recording was required at the time the interest was created. The defendants have not demonstrated that due process prohibits a state from requiring further periodic recording to achieve similar objectives. There is nothing inherent in a recording act which mandates that a recording be eternally effective, and the utility and benefits of requiring periodic recording of interests in land are well-recognized. A reasonable relationship exists between the requirement of the act that an owner take possession of the interest in the manner specified or record a claim of interest every 20 years and the public purpose sought to be achieved.

6. A reasonable relationship also exists between the purpose of the statute and the provisions vesting title to the dormant severed interest in the owner of the surface estate upon the

failure of the owner of the mineral interest to do any of the statutorily required acts. It places the title to the interest in one more likely to be located than the owners of the mineral interest, and thus tends to limit the difficulties presented by unknown or unlocatable owners of mineral interests. Although it must be just as logical to vest title in the owner of the nearest active mineral estate or in the state, or to provide that the state hold and sell the interest for the benefit of the owners, the existence of possible alternatives does not render a statute unconstitutional. If the relation between the statute and the public welfare is debatable, the legislative judgment must be accepted.

7. The defendants argue that the statute creates an arbitrary and unreasonable conclusive presumption of abandonment. The essential elements of abandonment are an intention to relinquish the property and acts putting that intention into effect. The act does not create any evidentiary presumption of abandonment. None of the provisions of the act purport to be concerned with the owner's intent to abandon. Rather, the act creates a rule of substantive law which requires owners of certain oil and gas rights to undertake acts indicative of ownership at least every 20 years. The statutory approach to these issues has the advantage of eliminating uncertainty and minimizing litigation. Even if the act created a presumption of abandonment, it would not be an unconstitutional one. It is within the Legislature's power and experience to conclude that owners who have not developed, transferred, or recorded their severed mineral interests for over 20 years have abandoned them. The defendants have failed to demonstrate that the presumed fact is not more likely than not to flow from the proved fact; therefore, they have not shown the act denies them due process of law by creating an unconstitutional presumption.

8. Due process requires that one deprived of liberty or property be afforded notice and an opportunity for a hearing at a meaningful time and in a meaningful manner. The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. The constitutional necessity for a hearing before deprivation rather than after is determined by balancing the competing interests at stake. Considering the interests subject to abandonment under the act, the risks of wrongful deprivation are minimal. The act does not deprive owners of productive interests but only applies to severed interests which have not been "worked" or recorded for over 20 years. Since the owner has not been in

actual possession of the interest for over 20 years, the risks of financial or other harm from the interim deprivation of such an interest are minimal. Moreover, a due process hearing before divestment would not necessarily give the owner of a dormant interest in oil and gas an opportunity to claim his interest, record it, and preserve it, but would only address the issue whether the elements of abandonment had been proven. The legislative determination not to require a hearing before the interests are deemed abandoned did not deprive the defendants of property without due process of law. The act does not limit the opportunity of the owners of a dormant interest for a post-deprivation hearing to determine whether the statutory requirements have been met and to ascertain the ownership of the property. Due process does not require a hearing prior to vesting title in the owner of the surface estate. The statute is also not unconstitutional in that it does not require notice of such a hearing prior to vesting title because the due-process right to notice of a hearing is implicit in and dependent upon a right to a hearing.

9. The Equal Protection Clause does not require the Legislature to address every aspect of a problem at once or to do nothing at all. The defendants have failed to show that treating dormant interests in oil and gas differently from interests in "hard" minerals is arbitrary or lacks a reasonable relation to the object of the legislation.

The act is not unconstitutional as applied in these cases. The decision of the Court of Appeals in *Van Slooten* is affirmed, that in *Bickel* is reversed, and the cases are remanded for further proceedings.

Justice Levin, joined by Justices Kavanagh and Williams, would hold that the statute unconstitutionally impairs the obligation of contracts:

1. While this case is decided under the contract clause of the state constitution, the decision is counseled by decisions of the Supreme Court of the United States interpreting the Federal clause. In modern construction of the Federal clause, forged under pressure of legislative efforts to deal with the Depression, a balancing approach was used, preserving the power of the states to act for the public good while limiting that power in order to implement the purposes of the clause. The Supreme Court of the United States has required that the impairment must be on reasonable conditions appropriately tailored to the public purpose giving rise to the legislation. The existence of an emergency and the temporary nature of the legislation are not essential preconditions, but are matters to be considered in

assessing the reasonableness of the legislative impairment of contracts. Other matters to be considered include the substantiality of the affected contractual term as an inducement to enter the contract, the degree to which the legislation is in response to circumstances unforeseen at the time of contracting and limits a party to his reasonable expectations, and whether the altered contractual term was originally based on a statute when the contract was entered.

2. Courts normally accord considerable deference to legislative assessments of the reasonableness and necessity of economic and social legislation, but where such legislation impairs contractual obligations, this deference must be harmonized with the courts' duty to apply the constitutional prohibition. The degree of deference depends on the severity of the contractual impairment. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the legislation.

3. The severity of the impairment in this case is not limited to the new obligation to take one of the specified acts or to record a claim of interest every 20 years to preserve the interest, because the failure to meet the new obligation also imposes a new consequence, forfeiture of the interest. When the impairment is seen as both the obligation and its consequences, the extreme severity of the impairment is clear. The act does not merely modify the owner's interest, it adds a term providing for its extinguishment. It is difficult, if not impossible, to imagine a greater impairment than one which can operate to void the contract entirely.

4. It may be true that the defendants were not substantially induced to obtain their interests in reliance on the fact that the interests need not be re-recorded. However, other reliance interests are at stake: the expectations that title to property will not be disturbed in the absence of a competing claim of title or possession, that if one's title is challenged or threatened one will have notice of it, and that under the Constitution the state will not act to impair, and certainly not to void, lawful contracts. In this case, the impairment was unexpected, and the contract is threatened with the certainty of extinction, not merely by potential destruction.

5. The act has the public purpose of encouraging development of oil and gas resources by terminating the ownership interests of inaccessible owners—ones who cannot be found—and vesting ownership in the surface owner. Given the severity of the impairment of contract and the lack of reasonable

conditions appropriately tailoring the impairment to the public purpose, the balance in these cases must be struck on the side of the Constitution. Terminating the interests of inaccessible owners is reasonable and appropriate to the statute's purposes, but terminating those of owners who can be located by reasonable diligence is not. The statute, however, makes no effort to distinguish the two groups. Also, the act's purpose can be achieved by measures short of forfeiture. A statutory royalty rate might be established, and the owner who fails to make the requisite filings may have a mineral lease at that rate imposed on him with proceeds to be paid into a custodial trust account. The Legislature is not confined to these alternatives, nor is an opinion expressed on the constitutionality of lesser impairments, but there is an absence of any effort to protect the owner's interests under the present scheme. It is the failure to limit the impairment to what is reasonable and necessary to achieve the valid public purpose of the statute that renders it an unconstitutional impairment of contract.

6. As a general rule, an unconstitutional statute is void *ab initio,* and thus contracts based on it create no rights or obligations. However, a principle of absolute retroactive invalidity cannot be justified. The actual existence of a statute prior to a determination of its unconstitutionality is an operative fact and may have consequences which cannot be ignored. In this case the statute was enacted 17 years ago; leases may have been entered into, and costly exploration and development may have gone on, in reliance on statutory forfeitures dating back 14 years. Such reliance would have been in direct furtherance of the basic legislative goal—development of energy resources. The good-faith reliance on a presumptively valid statute, in furtherance of the legislative goal, should not be upset by rigid application of retrospective invalidity.

7. Where a developer has entered a lease with a surface owner in reliance on a forfeiture under the statute, the lessee's rights under the lease should not be voided unless action in reliance on the lease has been minimal. However, future payments under the lease to the surface owner, rather than to the rightful owner of the sub-surface interest, cannot be justified. The rights to past payments will depend upon a balancing of the equities involved. Thus it follows that in *Van Slooten,* where the leases have been executed by the sub-surface owners, the leases should not be upset by the surface owner claiming under the unconstitutional statute. Where different developers have entered into competing leases, as in *Bickel*—one with the surface owners and the other with the sub-surface owners, the

situation is more difficult. The trial court should assess the equities in light of the differing degrees of action in reliance on the leases and, where the equities are close, give effect to the general rule of retroactive invalidity of unconstitutional statutes.

86 Mich App 437; 272 NW2d 675 (1978) affirmed.

83 Mich App 467; 268 NW2d 881 (1978) reversed.

### OPINION OF THE COURT

1. GAS AND OIL — DORMANT INTERESTS — CONSTITUTIONAL LAW — OBLIGATION OF CONTRACT.

The consequences of failing to undertake one of the acts specified by statute to "work" a dormant severed interest in oil and gas or to record a claim of interest every 20 years may be severe, but the obligation to record is so minimal that the presumption of constitutionality of the statute is not overcome by a claim that it impairs the obligation of contract where it cannot be seriously contended that the parties challenging the statute were substantially induced to enter oil and gas leases with owners of severed interests which were created by conveyances of real property before the enactment of the statute in 1963 in reliance on the fact that the interests need not be recorded, or that the requirement significantly changed their bargaining position (US Const, art I, § 10; Const 1963, art 1, § 10; MCL 554.291 *et seq.;* MSA 26.1163[1] *et seq.).*

2. GAS AND OIL — DORMANT INTERESTS — CONSTITUTIONAL LAW — OBLIGATION OF CONTRACT.

The dormant interest act does not unconstitutionally impair the obligation of contract because the requirement of periodic recording of a dormant severed interest in oil and gas furthers valid state interests, and the measure taken is hardly burdensome to the purchaser of the severed interest but is nonetheless an important one to the state's interest (US Const, art I, § 10; Const 1963, art 1, § 10; MCL 554.291 *et seq.;* MSA 26.1163[1] *et seq.).*

3. CONSTITUTIONAL LAW — DUE PROCESS — STATUTES — PRESERVING PROPERTY.

Statutes which require property owners in possession to institute a proceeding within a specified time or lose their property have been held unconstitutional because a state cannot require one in possession of all that he demands to prosecute a suit to preserve his interest when no adverse interest is asserted by suit or possession (US Const, Am XIV; Const 1963, art 1, § 17).

4. GAS AND OIL — DORMANT INTERESTS — CONSTITUTIONAL LAW —
   DUE PROCESS.

   The dormant interest act does not unconstitutionally change
   property rights of owners of severed interests in oil and gas
   into mere causes of action, although it does change the nature
   of the property interest owned to one which is subject to
   abandonment; the act does not require the owner to institute a
   suit to preserve title to the interest but requires only that the
   owner record a notice of his claim every 20 years (US Const,
   Am XIV; Const 1963, art 1, § 17; MCL 554.291 *et seq.*; MSA
   26.1163[1] *et seq.*).

5. CONSTITUTIONAL LAW — DUE PROCESS — STATUTES — PRESUMP-
   TIONS — BURDEN OF PROOF.

   A party who claims that an act is unreasonable, arbitrary and
   capricious and not a proper exercise of the police power carries
   the burden of overcoming the presumption of constitutionality
   and must prove either that no public purpose is served by the
   act or that no reasonable relationship exists between the rem-
   edy adopted and the purpose the Legislature sought to achieve
   by it (US Const, Am XIV; Const 1963, art 1, § 17).

6. CONSTITUTIONAL LAW — DUE PROCESS — STATUTES — PRESUMP-
   TIONS.

   The presumption of constitutionality favors the validity of a
   statute challenged as being a violation of the Due Process
   Clause; if the relationship between the statute and the public
   welfare is debatable, the legislative judgment must be accepted
   (US Const, Am XIV; Const 1963, art 1, § 17).

7. GAS AND OIL — DORMANT INTERESTS — PUBLIC PURPOSE.

   The clear purpose of the dormant interest act is to facilitate the
   development of oil and gas resources; the argument that en-
   couraging such development is not a valid public purpose is not
   persuasive (MCL 554.291 *et seq.*; MSA 26.1163[1] *et seq.*).

8. GAS AND OIL — DORMANT INTERESTS — CONSTITUTIONAL LAW —
   DUE PROCESS — PUBLIC PURPOSE.

   The dormant interest act works to the benefit of the public and to
   the benefit of the owners of severed oil and gas interests, as
   well as to the benefit of the owner to the surface estate, by
   improving the marketability of severed oil and gas interests,
   thereby increasing the development of fossil fuels, the revenues
   from property taxes and employment with its related benefits;
   therefore, the argument that the act is unconstitutional be-

cause of an absence of a valid public purpose is not persuasive (US Const, Am XIV; Const 1963, art 1, § 17; MCL 554.291 *et seq.;* MSA 26.1163[1] *et seq.).*

9. GAS AND OIL — DORMANT INTERESTS — CONSTITUTIONAL LAW — DUE PROCESS — PUBLIC PURPOSE.

A reasonable relationship exists between the remedy adopted in the dormant interest act and the public purpose the Legislature sought to achieve because the commercial nature of and the common-law rules relating to severed oil and gas interests have created significant problems for one attempting to secure title to, or permission to develop, a severed interest; the statutory requirement that an owner take possession of the severed interest in the manner specified or periodically record the interest, and the consequences of failure to comply are reasonably related to the public purposes of facilitating the development of these interests (US Const, Am XIV; Const 1963, art 1, § 17; MCL 554.291 *et seq.;* MSA 26.1163[1] *et seq.).*

10. CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS — STATUTES — RECORDS — DEEDS — VENDOR AND PURCHASER.

Statutes imposing recording requirements which have the effect of rendering a prior unrecorded deed void against a subsequent purchaser do not impair the obligation of contract where a reasonable time is provided for the recording of existing interests (US Const, art I, § 10; Const 1963, art 1, § 10).

11. CONSTITUTIONAL LAW — DUE PROCESS — STATUTES — RECORDS — DEEDS.

A state has the power, consistent with the Due Process Clause, to require the recording of an interest as a condition to preserving title to the interest when no recording was required at the time the interest was created; there is nothing inherent in a recording act which mandates that a recording be eternally effective and it has not been demonstrated that due process prohibits a state from requiring further periodic recording to achieve similar objectives (US Const, Am XIV; Const 1963, art 1, § 17).

12. GAS AND OIL — DORMANT INTERESTS — CONSTITUTIONAL LAW — DUE PROCESS — PUBLIC PURPOSE.

A reasonable relationship exists between the purpose of the dormant interest act and its provisions vesting title of the dormant severed oil and gas interest in the owner of the surface estate upon the failure to do any of the statutorily required acts because it places the title to the interest in one more likely to be located than the owners of the severed

interest, which is logically related to the purpose of limiting the difficulties presented by unknown or unlocatable owners; the fact that it may be just as logical to vest title in the owner of the nearest active mineral estate or in the state, or to provide that the state hold and sell the interest for the benefit of the owners, does not render the act unconstitutional (US Const, Am XIV; Const 1963, art 1, § 17; MCL 554.291 *et seq.;* MSA 26.1163[1] *et seq.).*

13. ABANDONED PROPERTY — ELEMENTS OF ABANDONMENT.

The essential elements of abandonment of property are an intention to relinquish the property and acts putting that intention into effect.

14. GAS AND OIL — DORMANT INTERESTS — PRESERVING PROPERTY.

The dormant interest act creates a rule of substantive law, rather than an evidentiary presumption of abandonment of property, which has the advantage of eliminating uncertainty and minimizing litigation by requiring owners of severed oil and gas interests to undertake acts indicative of ownership at least every 20 years (MCL 554.291 *et seq.;* MSA 26.1163[1] *et seq.).*

15. CONSTITUTIONAL LAW — DUE PROCESS — PRESUMPTIONS.

A statutory presumption violates the Due Process Clause if there is no rational connection between the facts established and the facts to be presumed (US Const, Am XIV; Const 1963, art 1, § 17).

16. GAS AND OIL — DORMANT INTERESTS — ABANDONED PROPERTY — CONSTITUTIONAL LAW — DUE PROCESS — PRESUMPTIONS.

It is within the Legislature's power and experience to conclude that owners who have not developed, transferred, or recorded their severed oil and gas interests for over 20 years have abandoned them, because the failure to develop, transfer, or record a severed interest for over 20 years is rationally connected to whether abandonment of property has occurred (US Const, Am XIV; Const 1963, art 1, § 17).

17. GAS AND OIL — DORMANT INTERESTS — CONSTITUTIONAL LAW — DUE PROCESS — HEARING.

The Due Process Clause does not require a hearing before a dormant severed interest in oil and gas vests, by operation of statute, in the owner of the surface estate because the statute only applies to severed interests which have not been worked, as defined in the act, or recorded for over 20 years, which means that the owners of such interests would only be subjected to minimal risks of financial or other harm from the

interim deprivation of their property; a pre-deprivation hearing
would only address the issue of whether the elements of aban-
donment had been proven, rather than giving the owner the
opportunity to preserve his dormant interest, and the statute
does not restrict the owner's right to a post-deprivation hearing
or to have a complete remedy available at that time (US Const,
Am XIV; Const 1963, art 1, § 17; MCL 554.291 *et seq.;* MSA
26.1163[1] *et seq.).*

18. GAS AND OIL — DORMANT INTERESTS — CONSTITUTIONAL LAW —
DUE PROCESS — NOTICE — HEARING.

The dormant interest act is not unconstitutional on the ground
that it does not have adequate provision for notice of a hearing
not provided for by the statute or constitutionally required
before a dormant severed interest in oil and gas vests, by
operation of the statute, in the owner of the surface estate,
because the due-process right to notice of a hearing is implicit
in and dependent upon a right to a hearing (US Const, Am
XIV; Const 1963, art 1, § 17; MCL 554.291 *et seq.;* MSA
26.1163[1] *et seq.).*

19. GAS AND OIL — DORMANT INTERESTS — ABANDONED PROPERTY —
CONSTITUTIONAL LAW — EQUAL PROTECTION.

It has not been shown that the dormant interest act, which
creates a rule of substantive law of abandonment of certain
dormant interests in oil and gas but not of interests in "hard"
minerals, creates a classification which is arbitrary or lacks a
reasonable relation to the object of the legislation; the Equal
Protection Clause does not require the Legislature to address
every aspect of a problem at once or to do nothing at all (US
Const, Am XIV; Const 1963, art 1, § 2; MCL 554.291 *et seq.;*
MSA 26.1163[1] *et seq.).*

DISSENTING OPINION BY LEVIN, J.

20. CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS — STATUTES.

*The Supreme Court of the United States has held, under the
Federal Obligation of Contracts Clause, that permissible legisla-
tive impairment of obligation must be on reasonable conditions
appropriately tailored to the public purpose giving rise to the
legislation; the existence of an emergency and the temporary
nature of the legislation are not essential preconditions, but are
matters to be considered in assessing the reasonableness of the
legislative impairment of contracts (US Const, art I, § 10).*

21. CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS — STATUTES.
*Courts normally accord considerable deference to legislative as-*

sessments of the reasonableness and necessity of economic and social legislation; however, where such legislation impairs contractual obligations, this deference must be harmonized with the courts' duty to apply the constitutional prohibition against impairment of the obligation of contracts (Const 1963, art 1, § 10).

22. CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS — STATUTES.

Minimal legislative alteration of contractual obligations may end the inquiry as to the constitutionality of the legislation at its first stage; severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the legislation (Const 1963, art 1, § 10).

23. GAS AND OIL — DORMANT INTERESTS — CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS.

The dormant interest act does not merely modify the interest of the owner of dormant severed oil and gas interests by imposing the obligation to do one of the specified acts or to record a claim of interest every 20 years to preserve it; it adds a term providing for the extinction of the interest, and it is difficult to imagine a greater legislative impairment of the obligation of contract than one which can operate to void the contract entirely (Const 1963, art 1, § 10; MCL 554.291 et seq.; MSA 26.1163[1] et seq.).

24. GAS AND OIL — DORMANT INTERESTS — CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS.

The dormant interest act imposed a completely unexpected impairment of the obligation of contract, given the reliance interests of owners of dormant severed oil and gas interests created before the enactment of the statute; the severity of the impairment, which threatens the dormant interests with extinction, clearly pushes the inquiry into the act's constitutionality, under the Obligation of Contracts Clause, to a careful examination of the nature and purpose of the legislation (Const 1963, art 1, § 10; MCL 554.291 et seq.; MSA 26.1163[1] et seq.).

25. GAS AND OIL — DORMANT INTERESTS — PUBLIC PURPOSE.

The dormant interest act has the purpose of encouraging development of oil and gas resources by terminating the ownership interests of inaccessible owners, ones who cannot be found, and vesting ownership in the surface owner (MCL 554.291 et seq.; MSA 26.1163[1] et seq.).

26. GAS AND OIL — DORMANT INTERESTS — CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS.

*Encouraging energy development promotes a basic interest of society, rather than of a narrow group, but the dormant interest act unconstitutionally impairs the obligation of contracts because it fails to limit the impairment to what is reasonable and necessary to achieve the valid public purpose of the statute, given the severity of the impairment it imposes; the act makes no effort to distinguish between owners of dormant severed oil and gas interests who are inaccessible and those who can be located by reasonable diligence, or to protect the present owner's interest in at least the proceeds of the development which it seeks to encourage (Const 1963, art 1, § 10; MCL 554.291 et seq.; MSA 26.1163[1] et seq.).*

27. CONSTITUTIONAL LAW — STATUTES — OBLIGATION OF CONTRACTS.

*An unconstitutional statute, as a general rule, is void ab initio, and thus contracts based on it create no rights or obligations; however, a principle of absolute retroactive invalidity cannot be justified because the actual existence of a statute, prior to a determination of unconstitutionality, is an operative fact and may have consequences which cannot be ignored (Const 1963, art 1, § 10).*

28. GAS AND OIL — DORMANT INTERESTS — CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS.

*Good-faith reliance on the dormant interest act when it was a presumptively valid statute, in furtherance of the legislative goal to encourage development of energy resources, should not be upset by rigid application of the general rule of retrospective invalidity of unconstitutional statutes; therefore, where a developer has entered a gas and oil lease with a surface owner in reliance on a forfeiture of dormant severed gas and oil interests under the statute before the Supreme Court declares that it is unconstitutional, the lessee's rights under the lease should not be voided unless action in reliance on the lease has been minimal, and the rights to past royalty payments under the lease will depend upon a balancing of the equities involved (Const 1963, art 1, § 10; MCL 554.291 et seq.; MSA 26.1163[1] et seq.).*

*Thompson, Zirnhelt & Bowron* (by *Peter J. Zirnhelt* and *John Michael Senger)* for plaintiff Van Slooten.

*Denfield, Timmer & Taylor* for plaintiffs Bickel, Getty Oil Company, Skelly Oil Company, Total Leonard, Inc., The Dow Chemical Company, and Saxon Oil Company.

*Dreyer & DuBois* (by *James D. Dreyer* and *Michael K. Cooper)* for defendants Larsen, Armstrong, and other heirs of Nellie F. Gill.

*Monaghan, Campbell, LoPrete, McDonald & Norris* for defendants Worth and Shell Oil Company.

COLEMAN, C.J. The issue in these cases is the constitutionality of the dormant mineral act, MCL 554.291 *et seq.;* MSA 26.1163(1) *et seq.,*[1] as applied

[1] MCL 554.291; MSA 26.1163(1) provides:

"Sec. 1. Any interest in oil or gas in any land owned by any person other than the owner of the surface, which has not been sold, leased, mortgaged or transferred by instrument recorded in the register of deeds office for the county where such interest is located for a period of 20 years shall, in the absence of the issuance of a drilling permit as to such interest or the actual production or withdrawal of oil or gas from said lands, or from lands covered by a lease to which such interest is subject, or from lands pooled, unitized or included in unit operations therewith, or the use of such interest in underground gas storage operations, during such period of 20 years, be deemed abandoned, unless the owner thereof shall, within 3 years after the effective date of this act or within 20 years after the last sale, lease, mortgage or transfer of record of such interest or within 20 years after the last issuance of a drilling permit as to such interest or actual production or withdrawal of oil or gas, from said lands, or from lands covered by a lease to which such interest is subject, or from lands pooled, unitized, or included in unit operations therewith, or the use of such interest in underground gas storage operations, whichever is later, record a claim of interest as hereinafter provided. Any interest in oil or gas deemed abandoned as herein provided shall vest as of the date of such abandonment in the owner or owners of the surface in keeping with the character of the surface ownership."

Statutes relating to severed mineral interests have been enacted in other jurisdictions. Although they are all designed to improve the marketability of severed mineral interests, they employ different approaches to their objective. Therefore it is necessary to analyze each statute's provisions in detail when comparing and contrasting it with Michigan's act. See Ill Ann Stat, ch 30, § 197 (Smith-Hurd), held unconstitutional in *Wilson v Bishop,* 82 Ill 2d 364; 412 NE2d 522 (1980),

to these oil and gas interests created prior to the passage of the act in 1963. In *Bickel v Fairchild,* 83 Mich App 467; 268 NW2d 881 (1978), the Court of Appeals held that the act unconstitutionally impaired the obligation of contract. In *Van Slooten v Larsen,* 86 Mich App 437; 272 NW2d 675 (1978), another panel of the Court of Appeals upheld the constitutionality of the act. We hold that the act does not unconstitutionally impair the obligations of contracts as applied in these cases.

I

In Michigan, the ownership of a mineral interest can be severed from the ownership of the surface estate, see *Rathbun v Michigan,* 284 Mich 521, 534; 280 NW 35 (1938). At common law, these severances create fee estates, corporeal hereditaments, for the owners of the severed mineral interests,[2] which could not be abandoned.[3]

---

Ind Code Ann §§ 32-5-11-1 *et seq.* (Burns), held constitutional in *Short v Texaco Inc,* — Ind —; 406 NE2d 625 (1980), Minn Stat Ann § 93.52 *et seq.,* Neb Rev Stat §§ 57-228—57-231, held unconstitutional in *Wheelock v Heath,* 201 Neb 835; 272 NW2d 768 (1978), SD Compiled Laws Ann § 43-30-8.1, NC Gen Stat §§ 1-42.1—1-42.3. See, also Minn Stat Ann § 93.55; Wis Stat Ann § 700.30, held unconstitutional in *Chicago & North Western Transportation Co v Pedersen,* 80 Wis 2d 566; 259 NW2d 316 (1977). See, also, Fla Stat Ann § 704.05, Ga Code Ann § 85-407.1, La Civ Code Ann art 753, Tenn Code Ann § 64-704, Va Code §§ 55-154, 55-155. See, also, fns 14, 15, 26 and 28, *infra.*

[2] See 54 Am Jur 2d, Mines and Minerals, § 116, p 299, 1A Thompson, Real Property, § 160, p 30.

[3] See 1 Williams & Meyers, Oil and Gas Law, § 210.1, p 110, Roberton, *Abandonment of Mineral Rights,* 21 Stanford L Rev 1227 (1969), Simonton, *Abandonment of Interests in Land,* 25 Ill L Rev 261 (1930). The rationale underlying the common-law prohibition against abandoning corporeal hereditaments concerns problems peculiar to feudal tenure and society, see 4 Kent, Commentaries (14th ed), p 259, Roberton, *supra,* 1228, but the prohibition still remains part of the common law, see *In re Estate of Matt Miller,* 274 Mich 190, 193; 264 NW 338 (1936). Interests in land can be abandoned in civil-law jurisdictions, see *Sena v United States,* 189 US 233, 239-240; 23 S Ct 596; 47 L Ed 787 (1903), La Civ Code Ann art 753. Incorporeal interests, such as easements and profits à *prendre,* are subject to

The dormant mineral act provides that if the owner of a severed oil and gas interest fails to take actual possession of the interest as specified in the act,[4] transfer the interest by recorded instrument, or record a notice of claim of interest for a period of 20 years, the interest is deemed abandoned and title to it vests in the owner or owners of the surface estate. The act, passed in 1963, also provided a three-year grace period in which owners of interests created before the act was passed could record a claim of interest and preserve their interests.

Although we recognize the fact that the Legislature *could have* adopted other, if more tortuous, means of addressing this foreseeably increasing problem of mineral shortages, it *did not.* Therefore, we must commence with the concept that the statute must be presumed to be constitutional.

## II

The relevant facts in these cases are very similar.[5] In both cases, the owner of the land sold it by a deed recorded prior to 1946, excepting from the conveyance the title to the oil and mineral estates. In 1963, the dormant mineral act was passed. Because the owners of the severed oil and gas interests had not performed any of the acts specified in the act or recorded a claim of interest for a period of over 20 years by 1966, their interests, pursuant to statute, were deemed abandoned and

---

abandonment at common law, see *Gerhard v Stephens,* 68 Cal 2d 864; 442 P2d 692; 69 Cal Rptr 612 (1968). It is the corporeal nature of these interests which necessitates the analysis of the state's police power in Part IV, *infra.*

[4] See fn 1, *supra.*

[5] The relevant facts are stated in more detail in *Bickel v Fairchild,* 83 Mich App 467; 268 NW2d 881 (1978), and *Van Slooten v Larsen,* 86 Mich App 437; 272 NW2d 675 (1978).

vested in the owners of the surface estates. In *Van Slooten,* the defendants, claiming through the reservation of title to the mineral interests in the deed severing the interests, executed oil and gas leases covering their interests in 1970. In *Bickel,* the owners of the mineral interests, the owners of the surface estate in 1966 and the present owners of the surface estate, all executed separate oil and gas leases covering the land in 1973 and 1974. The owners of the surface estates then filed suit to quiet title to the oil and gas interests.

### III

Defendants contend that the act unconstitutionally impairs the obligation of contracts, US Const, art I, § 10, Const 1963, art 1, § 10. They argue that the act severely impairs and destroys reliance interests, favors narrow private groups, was not prompted by any emergency or tailored to meet one and was not temporary or experimental, and thus that the statute unconstitutionally impairs the obligation of contracts. Compare *Home Building & Loan Ass'n v Blaisdell,* 290 US 398; 54 S Ct 231; 78 L Ed 413 (1934).

When adjudicating impairment claims, the first inquiry should be whether the act has, in fact, operated as a substantial impairment of the contract relationship. The severity of the impairment determines the height of the hurdle the act must clear, *Allied Structural Steel Co v Spannaus,* 438 US 234, 244-245; 98 S Ct 2716; 57 L Ed 2d 727 (1978).

*El Paso v Simmons,* 379 US 497; 85 S Ct 577; 13 L Ed 2d 446 (1965), is instructive in reaching the conclusion that, although the consequences of failing to undertake one of the specified acts or to record a claim of interest every 20 years may be

severe, the obligation to record is so minimal that the presumption of constitutionality is not overcome.

*El Paso* involved a Texas statute that cut off a purchaser's right to re-claim land forfeited to the state for non-payment of the purchase price after five years from the original default. Prior to the enactment of the statute, a purchaser's right to have claims reinstated by paying the full amount due up to the date of reinstatement was unlimited. The Court upheld the statute although failure to meet the additional requirement (payment within five years) resulted in a complete forfeiture of any remaining rights in the property.

In the instant cases, the impairment or additional obligation imposed by the act cannot seriously be contended to have comprised a "high" hurdle. Neither can it be seriously contended that the defendants were substantially induced to enter the initial contractual relationships in reliance on the fact that their interests need not be recorded, or recorded more than once, or that such a requirement significantly changed their bargaining position.

In *Short v Texaco, Inc,* — Ind —; 406 NE2d 625 (1980), the Court upheld Indiana's mineral lapse act, Ind Code §§ 32-5-11-1 *et seq.,* a statute similar to Michigan's dormant mineral act, holding that it did not violate the constitutional prohibition against impairment of obligations of contract. The Court found the act, for the purpose of constitutional analysis, analogous to acts of limitation. The Court concluded that the Legislature adopted means which were rationally related to its valid objectives and held that the act did not unconstitutionally impair the obligation of contract.

Recording statutes long have been upheld in the

face of constitutional challenges on impairment grounds, see *Jackson v Lamphire,* 28 US 280; 7 L Ed 679 (1830). The requirement of periodic recording furthers valid state interests. "The measure taken * * * was a mild one indeed, hardly burdensome to the purchaser * * * but nonetheless an important one to the State's interest", *El Paso, supra,* 516-517.

We hold that MCL 554.291 *et seq.;* MSA 26.1163(1) *et seq.* does not unconstitutionally impair the obligation of contract.

## IV

Defendants claim the act violates the constitutional protection against deprivation of property without due process of law, US Const, Am XIV, Const 1963, art 1, § 17. Defendants argue that by making a corporeal hereditament subject to abandonment the act has unconstitutionally changed the nature of defendants' interests and by requiring a record owner in constructive possession to take specific actions to preserve the interest, the act has unconstitutionally changed a property right into a mere cause of action, see *Groesbeck v Seeley,* 13 Mich 329 (1865).[6] Statutes which require property owners *in possession* to institute a proceeding within a specified time or lose their property have been held unconstitutional because a state cannot require one in possession of all that he demands to prosecute a suit to preserve his interest when no adverse interest is asserted by suit or possession, see *Groesbeck, supra,* 343.

[6] See, also, *Biltmore Village v Royal,* 71 So 2d 727 (Fla, 1954), *Murrison v Fenstermacher,* 166 Kan 568; 203 P2d 160 (1949), *Girard Trust Co v Pennsylvania R Co,* 364 Pa 576; 73 A2d 371 (1950), Anno: *Constitutionality of a statute which reduces title to real estate to a mere cause of action,* 7 ALR2d 1366.

Significant differences exist, however, between the dormant mineral act and the statutes which have been held unconstitutional for converting a property right into a mere cause of action. This act specifically exempts from its abandonment provisions those interests which have been occupied as specified in the act at any time within the last 20 years. More importantly, the act does not require the owner to institute a suit (at a time when conceivably there is no one to sue) to preserve title to the interest. The act only requires the owner to record a notice of his claim every 20 years. Although the validity of such recording requirements will be discussed more thoroughly *infra*,[7] it is sufficient to recognize at this point that statutes imposing recording requirements have been upheld when a reasonable time is provided for recording existing interests, see *Wichelman v Messner,* 250 Minn 88; 83 NW2d 800 (1957). We therefore hold that the act does not unconstitutionally change defendants' property rights into mere causes of action.

However, the act does convert a corporeal hereditament which at common law could not be abandoned into an interest which is subject to abandonment. Whether this change constitutes a deprivation of property without due process depends upon whether it was a proper exercise of the state's police powers, see *Wyant v Director of Agriculture,* 340 Mich 602, 608; 66 NW2d 240 (1954).

Defendants claim that the act is unreasonable, arbitrary and capricious, and not a proper exercise of the police power. Accordingly, they carry the burden of overcoming the presumption of constitutionality[8] and must prove either that no public

[7] See Part IV B, *infra.*

[8] See *Shavers v Attorney General,* 402 Mich 554, 613; 267 NW2d 72

purpose is served by the act or that no reasonable relationship exists between the remedy adopted and the public purpose sought to be achieved.[9] The presumption of constitutionality favors validity and if the relationship between the statute and public welfare is debatable, the legislative judgment must be accepted, see *Grocers Dairy Co v Dep't of Agriculture Director,* 377 Mich 71, 76; 138 NW2d 767 (1966), *Carolene Products Co v Thomson,* 276 Mich 172, 178; 267 NW 608 (1936).

## A

Defendants claim that no valid public purpose is furthered by the act because at the time of its enactment the fuel crisis and need for developing oil and gas resources were not critical. However, the clear purpose of the act is to facilitate the development of oil and gas resources, see *Van Slooten, supra,* 446, Street, *Need for Legislation to Eliminate Dormant Royalty Interests,* 42 Mich State Bar J 49 (March, 1963).[10] The importance of facilitating the development of oil and gas resources was recognized long before the current "energy crisis".[11] Defendants' argument that encouraging the development of oil and gas resources is not a valid public purpose is not persuasive.

(1978), *Michigan Canners & Freezers Ass'n, Inc v Agricultural Marketing & Bargaining Board,* 397 Mich 337, 343-344; 245 NW2d 1 (1976), *Thayer v Dep't of Agriculture,* 323 Mich 403, 411; 35 NW2d 360 (1949).

[9] See *Shavers, supra,* 612, *Michigan Canners, supra, Grocers Dairy Co v Dep't of Agriculture Director,* 377 Mich 71, 76; 138 NW2d 767 (1966).

[10] See Minn Stat Ann § 272.039 which declares that one of its purposes is to cure problems in "identification of separately owned mineral interests by taxing authorities requir[ing] title searches which are extremely burdensome and, where no public tract index is available, prohibitively expensive." See, also, Minn Stat Ann § 93.52, NC Gen Stat §§ 1-42.1—1-42.3.

[11] See Veasey, *Law of Oil and Gas,* 18 Mich L Rev 445 (1920).

Although the most apparent benefactor of the act is the owner of the surface estate who may receive title to the interest upon the owner's failure to record, others will also benefit from the act. The primary purpose of the act is not to vest title to the severed interests in the surface owner but rather is to facilitate development of those subsurface properties by reducing the problems presented by fragmented and unknown ownership. The act as a whole works to the benefit of the public by improving the marketability of severed mineral interests and thereby increasing the development of fossil fuels, the revenues from property taxes, and employment with its related benefits. Defendants have not demonstrated that the act is unconstitutional because of the absence of a valid public purpose.

B

Defendants also argue that no reasonable relationship exists between the remedy adopted and the public purpose to be achieved because the act does not facilitate the development of mineral estates. Further, they contend that in purporting to transfer title to the owner of the surface estate, the act does not facilitate negotiations and development but actually hinders them by removing the developer's security in dealing with an owner of record. In any event, defendants argue, it would be more logical to vest title to the abandoned estate in the owner of the nearest active mineral estate rather than the owner of the surface estate.

Contrary to defendants' contentions, we conclude that a reasonable relationship exists between the remedy adopted and the public purpose sought to be achieved. The commercial nature of, and

common-law rules relating to, severed mineral interests have created significant problems for one attempting to secure title to, or permission to develop, a severed mineral interest.

Upon severance of the surface and mineral estates, the ownership of the mineral estate often becomes fractionalized with the passage of time.[12] The commercial nature of these interests makes it likely that they may be owned by a number of people who are not familiar with the property, the owner of the surface estate or even each other. Moreover, in the absence of a recording statute, there are no countervailing influences in the law to reduce or limit the tendency of these fractional interests to be owned by unknown or unlocatable owners. Unlike incorporeal interests, corporeal interests cannot be abandoned under the common law.[13] Furthermore, absent actual possession of the severed mineral estate, possession of the surface estate pursuant to a deed reserving a severed mineral interest cannot ripen into adverse possession of the mineral estate.[14] Also, in the absence of actual development of the severed mineral estates

---

[12] Frequently, portions or fractional interests in these severed oil interests are divided among several persons in attempts to spread the cost of their acquisition or to limit the risks assumed by each individual. Interests may also become fractionalized as their owners sell portions of them for profit as opposed to profiting from the development and sale of the oil. Distributions following the death of an interest holder also tend to create fractional interests owned by a number of persons, see Kuntz, *Old and New Solutions to the Problem of the Outstanding Undeveloped Mineral Interest,* 22 Institute on Oil & Gas Law & Taxation 81 (1971).

[13] See fn 3, *supra.*

[14] 1 Williams & Meyers, *supra,* § 224.1, p 339, Kuntz, *Adverse Possession of Severed Mineral Interests,* 5 Rocky Mountain Mineral Law Institute 409 (1959), Case Note, *Mines and Minerals—Oil and Gas—What Constitutes Adverse Possession of Severed Mineral Interest by Surface Possessor,* 17 Ala L Rev 126 (1964). Anno: *Acquisition of title to mines or minerals by adverse possession,* 67 ALR 1440, supplemented in 35 ALR2d 124. See Ga Code Ann § 85-407.1 which changes these common-law rules in an attempt to cure problems caused by dormant mineral interests.

(the act would then be inapplicable), it is unlikely that property tax assessment rolls will contain the names of their owners.[15] Accordingly, the title to the severed mineral estate tends to become fractionalized over time and increases the likelihood that a potential developer will not be able to locate the owners of the interest to make the conveyance necessary to begin the development process. Without a recording requirement, the task of locating the necessary owners may be impossible or prohibitively expensive.[16] Moreover, the alternative of attempting to develop the mineral interest without the owner's consent is not attractive.[17]

Therefore, the dormant mineral act was passed to reduce the likelihood that the presence of unknown or unlocatable owners or fractionalized ownership of severed interests would unnecessarily hinder or prevent the development of these resources by requiring an owner to do certain specified acts indicating ownership or record a claim of interest every 20 years. It places no undue burden

[15] See Minn Stat Ann § 272.039, Roberton, *supra*, 1231, Street, *Need for Legislation to Eliminate Dormant Royalty Interests*, 42 Mich State Bar J 49 (March, 1963). See, also, Minn Stat Ann §§ 272.04, subd 1; 273.13, subd 2a, Wis Stat Ann § 700.30, which attempt to cure problems caused by dormant mineral interest by taxing them.

[16] See 1 Williams & Meyers, *supra*, § 224.1, p 345. Given the risks involved in the exploration for oil resources and the uncertainty of whether any recovery will be realized, any significant increase in preparatory costs may become prohibitive.

[17] In proceeding without the owner's consent, all risks and expenses are assumed by the developer. If oil is discovered and the operation is successful, the owner can sue in trespass and recover either the value of the resources or their value minus the expenses of recovery depending on whether the trespasser acted in good or bad faith, see 1 Williams & Meyers, *supra*, § 226, p 372. In any event, the developer assumes all the risks in attempting to recover the oil. Furthermore, if the attempt at recovery is unsuccessful, the developer not only bears all the expenses but may be sued for damages caused by impairing the land's speculative value as a potential oil source, see *Humble Oil & Refining Co v Kishi*, 276 SW 190, 191 (Tex Comm App, 1925), Kuntz, *Old and New Solutions, supra*, 86-88, Roberton, *supra*, 1232-1233, 1 Williams & Meyers, *supra*, § 229, p 401.

upon owners. Without such a requirement, knowledge of the ownership could be lost in time. Potential resources go undeveloped in the absence of viable ownership.

The recording provision of the act provides a simple method by which owners of undeveloped severed mineral interests can preserve them. Statutes imposing recording requirements have been upheld when a reasonable time is provided for the recording of existing interests, see *Wichelman, supra.* Even before the adoption of US Const, Am XIV, the United States Supreme Court upheld the constitutionality of a recording statute, stating:

"It is within the undoubted power of state legislatures to pass recording acts, by which the elder grantee shall be postponed to a younger, if the prior deed is not recorded within the limited time; *and the power is the same whether the deed is dated before or after the passage of the recording act. Though the effect of such a law is to render the prior deed fraudulent and void against a subsequent purchaser, it is not a law impairing the obligation of contracts;* such too is the power to pass acts of limitations, and their effect. Reasons of sound policy have led to the general adoption of laws of both descriptions, and their validity cannot be questioned.

*        *        *

"As this court is confined to the consideration of only one question growing out of this law, we do not think it necessary to examine its provisions in detail: it is sufficient to say, that we can see nothing in them inconsistent with the constitution of the United States, or the principles of sound legislation. *Whether it is considered as an act of limitations, or one in the nature of a recording act, or as a law sui generis, called for by the peculiar situation of that part of the state on which it operates; we are unanimously of opinion, that it is not a law which impairs the obligation of a contract".* *Jackson v Lamphire, supra,* 290-291. (Emphasis added.)

Given that a state has the power to require the recording of an interest as a condition to preserving title to the interest when no recording was required at the time the interest was created, the defendants have not demonstrated that due process prohibits a state from requiring further periodic rerecording to achieve similar objectives,[18] see *Evans v Finley,* 166 Or 227; 111 P2d 833 (1941), *Opinion of the Justices,* 101 NH 515; 131 A2d 49 (1957), *Wichelman, supra,* Simes & Taylor, Improvement of Conveyancing by Legislation (Ann Arbor: University of Michigan Law School, 1960), p 268. There is nothing inherent in a recording act which mandates that a recording be eternally effective, see *American Land Co v Zeiss,* 219 US 47; 31 S Ct 200; 55 L Ed 82 (1911). The utility and benefits of requiring periodic recording of interests in land are well-recognized. For these reasons we conclude that a reasonable relationship exists between the act's requirement that an owner take possession of the interest in a manner specified or record a claim of interest every 20 years and the public purpose sought be achieved.

[18] In analogizing the dormant mineral act to a recording statute, one must recognize that differences exist between them. Although both may operate to divest an owner of his title, the recording act was designed to protect bona fide purchasers while the dormant mineral act may favor one who has never claimed an interest in the mineral estate.

It is sufficient to note at this time that the acts further different objectives. The dormant mineral act was designed to remedy problems that were not addressed by the recording act. The recording act eliminated many of the problems relating to bona fide purchasers. Any purchaser of these lands will have record notice of the severed mineral interests.

The dormant mineral act was designed to increase the marketability of these mineral interests by requiring periodic recording to reduce the problems caused by owners whose identity and location are unknown. Recognizing that increasing marketability or removal of fetters to marketability are valid public purposes, we are persuaded that the requirement of periodic recording is as reasonably related to this objective as the original recording requirement is related to the objective or protecting bona fide purchasers.

A reasonable relationship also exists between the purpose of the statute and the provisions vesting title of the severed interest in the owner of the surface estate upon the failure to do any of the statutorily required acts. It places the title to the interest in one more likely to be located than the owners of the mineral interest. Potential developers, owners of other severed interests, and the owners of the surface estate are then in a position to begin the preparatory steps necessary for development. Similar results follow upon abandonment of other incorporeal mineral interests in other states,[19] and under common-law concepts of adverse possession.[20] Although vesting title in the owner of the surface estate does not guarantee that the interest's potential for development will be realized, the act was not designed to remove all possible impediments to development.[21] Its purpose is to limit the difficulties presented by unknown or unlocatable owners.

While recognizing that it may be just as logical to vest title in the owner of the nearest active mineral estate or in the state,[22] or to provide that the state hold and sell the interest for the benefit of the owners,[23] we also must recognize that possi-

---

[19] In civil-law jurisdictions the title to abandoned severed mineral interests vest in the owner of the estate from which they were carved, see La Civ Code Ann arts 753, 3546. The same result occurs upon the abandonment of incorporeal interests in land at common law, see *Gerhard, supra.*

[20] See Anno, 35 ALR2d, *supra,* 124, 129, 173.

[21] The act is merely one portion of the Legislature's efforts to remove and regulate unwarranted impediments to the development of oil resources, see MCL 319.1 *et seq.;* MSA 13.139(1) *et seq.,* MCL 319.101 *et seq.;* MSA 13.140(1) *et seq.*

[22] See *Derry v Ross,* 5 Colo 295 (1880), Minn Stat Ann § 93.55, 1 Am Jur 2d, Abandoned Property, § 6, pp 8-9. At common law, abandoned property was not the subject of escheat, but was subject to appropriation by the sovereign as *bona vacantia,* see *Anderson National Bank v Luckett,* 321 US 233, 240; 64 S Ct 599; 88 L Ed 692 (1944).

[23] See MCL 319.108; MSA 13.140(8).

ble alternatives do not render the act unconstitutional. "[I]f the relation between the statute and the public welfare is debatable, the legislative judgment must be accepted," *Carolene Products Co v Thomson, supra,* 178.

V

Defendants argue that the act violates due process by creating an arbitrary and unreasonable conclusive presumption of abandonment, see *Heiner v Donnan,* 285 US 312; 52 S Ct 358; 76 L Ed 772 (1932), *Detroit v Bowden,* 6 Mich App 514; 149 NW2d 771 (1967), *lv den* 379 Mich 772 (1967).

The essential elements of abandonment are an intention to relinquish the property and acts putting that intention into effect, see *Log-Owners' Booming Co v Hubbell,* 135 Mich 65, 69; 97 NW 157 (1903), *Emmons v Easter,* 62 Mich App 226; 233 NW2d 239 (1975). Defendants claim that the actions listed in the act are not the only means by which one can possess or indicate ownership of a severed mineral estate and that the failure to do any of the acts specified in the statute is not necessarily determinative of an owner's intent to abandon. Because abandonment is concerned with the owner's intent to abandon, due process forbids the taking of property on the basis of a permanent and irrebuttable presumption of abandonment which is "not necessarily or universally true in fact", they argue. See *Vlandis v Kline,* 412 US 441, 452; 93 S Ct 2230; 37 L Ed 2d 63 (1973).

Contrary to defendants' arguments, the act does not create any evidentiary presumption. None of the provisions of the act purport to be concerned with the owner's intent to abandon, compare *Vlandis, supra,* 452; *Weinberger v Salfi,* 422 US 749, 770-772; 95 S Ct 2457; 45 L Ed 2d 522 (1975).

Rather, the act is designed to increase the marketability and development of severed mineral interests by creating a rule of substantive law which requires owners to undertake minimal acts indicative of ownership at least every 20 years. The statutory approach to these issues has the added advantage of eliminating uncertainty and minimizing litigation,[24] see *In re Mercure Estate,* 391 Mich 443, 448; 216 NW2d 914 (1974).

Even *arguendo* accepting defendants' characterization of the abandonment provisions as a presumption, the act does not create an unconstitutional presumption. A statutory presumption violates due process if there is no rational connection between the facts established and the facts to be presumed.[25] Although the failure to occupy or

[24] The same result could have been achieved without any reference to the concept of abandonment by "deeming the owner of the surface estate to have marketable record title to the severed interest" at the expiration of the statutory period, see MCL 565.101 *et seq.;* MSA 26.1271 *et seq.,* see, also, NC Gen Stat §§ 1-42.1—1-42.3, SD Compiled Laws Ann § 43-30-8.1. Marketable title acts have been upheld in the face of constitutional challenges, see *Miami v St Joe Paper Co,* 364 So 2d 439 (Fla, 1978), *Tesdell v Hanes,* 248 Iowa 742; 82 NW2d 119 (1957), *Wichelman v Messner,* 250 Minn 88; 83 NW2d 800 (1957), Aigler, *Constitutionality of Marketable Title Acts,* 50 Mich L Rev 185 (1951), supplemented in 56 Mich L Rev 225 (1957), Note, *Constitutionality of Marketable Title Legislation,* 47 Iowa L Rev 413 (1962). Although the dormant mineral act does not attempt to cure problems caused by conflicting claims in the same chain of title, its purpose is similar to the purpose of the marketable title acts in that it is designed to remove impediments to a severed mineral interest title's marketability caused primarily by the presence of unknown or unlocatable owners of undeveloped interests. Although the sources of the claims affected by the acts are different, the two acts have similar objectives and requirements and both lead to substantially the same result.

[25] See *Cleveland Board of Education v La Fleur,* 414 US 632; 94 S Ct 791; 39 L Ed 2d 52 (1974), *United States Dep't of Agriculture v Murry,* 413 US 508; 93 S Ct 2832; 37 L Ed 2d 767 (1973), *Vlandis v Kline,* 412 US 441; 93 S Ct 2230; 37 L Ed 2d 63 (1973), *Bell v Burson,* 402 US 535; 91 S Ct 1586; 29 L Ed 2d 90 (1971), *Heiner v Donnan,* 285 US 312; 52 S Ct 358; 76 L Ed 772 (1932), see, also, *Leary v United States,* 395 US 6, 36; 89 S Ct 1532; 23 L Ed 2d 57 (1969), *People v Gallagher,* 404 Mich 429, 438; 273 NW2d 440 (1979).

develop a mineral interest for an extended length
of time would not, in itself, be sufficient to support
a finding of abandonment at common law, see
*Doty v Gillett,* 43 Mich 203; 5 NW 89 (1880), it is
within the Legislature's power and experience to
conclude that the owners who have not developed,
transferred or recorded their severed mineral in-
terests for over 20 years have abandoned them.[26]
Although some owners who have not completed
any of the requirements specified in the act may
have never intended to abandon their interests,
defendants have not demonstrated that the pre-
sumed fact is not "more likely than not to flow
from the proved fact".[27] Considering the nature of
the interests affected by the act and the rational
connection existing between the proven facts and
the determination of abandonment, defendants
have not demonstrated that the act denies them
due process of law by creating an unconstitutional
presumption.

## VI

Defendants also claim that the act violates due
process because it contains no provisions for no-
tice[28] or a hearing to determine the validity of the

[26] Although not controlling, the relevancy of such failures is demon-
strated by other states' statutes which deem the interest abandoned
after non-use over an extended period of time, see Ill Ann Stat, ch 30,
§ 197 (Smith-Hurd) (25 years), Ind Code Ann § 32-5-11-1 (Burns) (20
years), Neb Rev Stat § 57-229 (23 years).

[27] *Leary, supra,* 36.

[28] The act, itself, provides sufficient notice of its recording require-
ments, see *Anderson National Bank v Luckett, supra,* 243, *North
Laramie Land Co v Hoffman,* 268 US 276, 283; 45 S Ct 491; 69 L Ed
953 (1925), *Grand Rapids Independent Publishing Co v Grand Rapids,*
335 Mich 620, 630; 56 NW2d 403 (1953), *Wichelman, supra,* 110,
*Presbytery of Southeast Iowa v Harris,* 226 NW2d 232 (Iowa, 1975), 58
Am Jur 2d, Notice, § 21, p 503, 66 CJS, Notice, § 13, p 650, but see
*Contos v Herbst,* 278 NW2d 732 (Minn, 1979). The discussion of notice
in this section concerns notice as it relates to an opportunity for a

"abandonment" before the title vests in the owner of the surface estate, see *Contos v Herbst,* 278 NW2d 732, 743 (Minn, 1979); *Wheelock v Heath,* 201 Neb 835, 844; 272 NW2d 768 (1978).

It has been repeatedly observed that due process requires that one deprived of liberty or property be afforded notice and an opportunity for a hearing held "at a meaningful time and in a meaningful manner"[29] and that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation".[30] As the scope and extent of the due process protections have been drawn into sharper focus in recent cases concerning the requirement of a pre-deprivation hearing, it has been recognized that the constitutional necessity for such a hearing is determined by balancing the competing interests at stake, see *Arnett v Kennedy,* 416 US 134, 212; 94 S Ct 1633; 40 L Ed 2d 15 (1974) (Marshall, J., dissenting with Brennan and Douglas, JJ.), *Rockwell v Crestwood School Dist Board of Education,* 393 Mich 616, 634; 227 NW2d 736 (1975). The predominant interests secured by a pre-deprivation hearing are protection against wrongful deprivation and, assuming ultimate vindication of the owner, protection against unnecessary interim damages, see *Rockwell, supra,* 635. When the risks from wrongful deprivation are significant, a pre-deprivation hearing is required in the absence of any countervailing considerations, see *Contos, supra,* 744, *Fuentes v Shevin,* 407 US

hearing, see *Mullane v Central Hanover Bank & Trust Co,* 339 US 306; 70 S Ct 652; 94 L Ed 865 (1950).

[29] *Armstrong v Manzo,* 380 US 545, 552; 85 S Ct 1187; 14 L Ed 2d 62 (1965), see, also, *Rockwell v Crestwood School Dist Board of Education,* 393 Mich 616, 634; 227 NW2d 736 (1975).

[30] *Cafeteria & Restaurant Workers Union v McElroy,* 367 US 886, 895; 81 S Ct 1743; 6 L Ed 2d 1230 (1961), see, also, *Rockwell, supra.*

67, 82; 92 S Ct 1983; 32 L Ed 2d 556 (1972), *Boddie v Connecticut,* 401 US 371, 378-379; 91 S Ct 780; 28 L Ed 2d 113 (1971).

However, considering the interests encompassed by this act, the risks of wrongful deprivation are minimal. The act does not deprive owners of productive interests of their property without a hearing[31] but only applies to severed interests which have not been worked, as defined in the act, or recorded for over 20 years. Therefore, since the owner has not been in actual possession of the interest for over 20 years, the risks of financial or other harm from the interim deprivation are minimal.[32] Moreover, a pre-deprivation due process hearing would not necessarily give the owner an opportunity to claim the interest, record it and preserve it[33] but would only address the issue of whether the elements of abandonment had been proven. Balancing the minimal protection afforded by requiring a pre-deprivation hearing against countervailing considerations,[34] the legislative de-

[31] Compare Minn Stat Ann §§ 93.55, 272.039 which apply to productive as well as nonproductive interests and were held unconstitutional in *Contos v Herbst, supra.* See, also, Wis Stat Ann § 700.30.

[32] Although the Supreme Court in *Fuentes v Shevin,* 407 US 67, 88-90; 92 S Ct 1983; 32 L Ed 2d 556 (1972), rejected the argument that a prior hearing was required only when "necessities" were involved and quoted from Justice Harlan's concurring opinion in *Sniadach v Family Finance Corp of Bay View,* 395 US 337, 342; 89 S Ct 1820; 23 L Ed 2d 349 (1969), that some form of notice and a hearing is required before deprivation of a property interest that "cannot be characterized as *de minimis",* this act applies only to dormant interests which have not been used or recorded for a period of over 20 years and are deemed abandoned. Since the owner has abandoned the property under the statute, those provisions of the act which vest title to the severed interest in the surface owner deprive him of nothing, see *Mullane, supra.* For these reasons we hold that the statute does not deny defendants of their property without due process of law, see *Wichelman, supra,* 110, *Presbytery of Southeast Iowa v Harris, supra,* 242, contra: *Wheelock, supra,* 845.

[33] But see *Wheelock, supra.*

[34] See Bubalo, *Constitutionality of Retroactive Land Statutes—Indiana's Model Dormant Mineral Act,* 12 Ind L Rev 454, 472-473 (1979).

termination not to require a pre-deprivation hearing did not deprive defendants of property without due process of law.

Furthermore, the act does not limit the owner's opportunity for a hearing to determine whether the statutory requirements have been met and to ascertain the ownership of the property.[35] Although a pre-deprivation hearing is not required, there exists an opportunity for a hearing to be held at a meaningful time. For these reasons, we hold that due process does not require a hearing prior to vesting title in the owner of the surface estate, see *Short, supra,* contra, *Wilson v Bishop,* 82 Ill 2d 364; 412 NE2d 522 (1980).

Because the due process guarantees do not require a hearing prior to vesting title in the owner of the surface estate, we do not accept defendant's claim that the absence of any provision in the statute for *notice* of such a hearing renders it constitutionally infirm. The constitutional right to notice of a hearing is implicit in and dependent upon a right to an opportunity for a hearing. No such hearing is provided for or required by the statute; therefore it is not unconstitutional on the basis that it does not have adequate provisions for notice of such a hearing.

## VII

We summarily reject defendants' equal protection claims, US Const, Am XIV, Const 1963, art 1, § 2. The Equal Protection Clause does not require the Legislature to address every aspect of a problem at once or do nothing at all, *O'Donnell v State Farm Mutual Automobile Ins Co,* 404 Mich 524, 543; 273 NW2d 829 (1979). Defendants have failed

---

[35] Compare, Minn Stat Ann § 93.55, *Contos, supra,* 742.

to show that treating oil and gas interests differently from "hard" minerals is arbitrary or lacks a reasonable relation to the object of the legislation, see *Forest v Parmalee*, 402 Mich 348; 262 NW2d 653 (1978), *McAvoy v H B Sherman Co*, 401 Mich 419, 453-454; 258 NW2d 414 (1977).

We hold that the act is not unconstitutional as applied in these cases. The Court of Appeals decision in *Bickel* is reversed, and in *Van Slooten* is affirmed. Remanded for further proceedings consistent with this opinion.

No costs, this being a public question.

FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred with COLEMAN, C.J.

LEVIN, J. *(to reverse Van Slooten and affirm Bickel).* Our state Constitution provides that "[n]o * * * law impairing the obligation of contract shall be enacted".[1] The United States Constitution provides that "[n]o State shall * * * pass any * * * Law impairing the Obligation of Contracts".[2] While deciding these cases under our state Contract Clause, we are counseled by decisions of the United States Supreme Court interpreting the federal clause.

I

Modern construction of the Contract Clause was forged under the pressure of legislative efforts to deal with the Depression. A balancing approach was used, preserving the power of the states to act for the public good while limiting that power in order to implement the purposes of the clause. Thus, in the leading case of *Home Building &*

---

[1] Const 1963, art 1, § 10.

[2] US Const, art I, § 10.

*Loan Ass'n v Blaisdell,*[3] the Court upheld a Minnesota mortgage moratorium law although the law impaired the contractual foreclosure rights of lenders. The Court found five factors critical. First, the legislature had declared, with adequate basis, an emergency need for the moratorium legislation.[4] Second, the law was addressed to the protection of a basic interest of society rather than to the advantage of particular individuals.[5] Third, the relief afforded was tailored to the emergency.[6] Fourth, the legislation was reasonable. In particular, it preserved the integrity of the mortgage indebtedness, provided rental compensation to the mortgagee during the moratorium, and preserved the primary concern of mortgagees—reasonable protection of their investment security.[7] Finally, the legislation was limited in time to the duration of the emergency.[8]

In a trio of subsequent cases, the failure to closely confine the contractual impairments to what was necessary to implement the state's purpose caused legislation to be found invalid under the Contract Clause. In *W B Worthen Co v Thomas,*[9] an Arkansas law exempted life insurance proceeds from collection by the beneficiary's judgment creditors. The Court noted that the exercise of a state's reserved powers "must be limited by reasonable conditions appropriate to the emergency",[10] and found the Contract Clause violated

---

[3] *Home Building & Loan Ass'n v Blaisdell,* 290 US 398; 54 S Ct 231; 78 L Ed 413; 88 ALR 1481 (1934).

[4] *Id.,* pp 444-445.

[5] *Id.,* p 445.

[6] *Id.*

[7] *Id.,* pp 445-447.

[8] *Id.,* p 447.

[9] *W B Worthen Co v Thomas,* 292 US 426; 54 S Ct 816; 78 L Ed 1344 (1934).

[10] *Id.,* p 433.

because the law had no limits as to "time, amount, circumstances, or need".[11]

In *W B Worthen Co v Kavanaugh*,[12] an Arkansas law impairing the remedies of mortgage bond holders was found to have destroyed "nearly all the incidents that give attractiveness and value to collateral security".[13] The failure to tailor the amount, necessity and duration of relief to the emergency resulted in a finding of invalidity under the Contract Clause.

Finally, in *Treigle v Acme Homestead Ass'n*,[14] the Court emphasized the need for a public purpose behind legislation impairing contracts. There, a Louisiana law altered the withdrawal rights of members of a building and loan association. The Court found that the law merely altered the rights of members *vis-à-vis* each other, without promoting any public purpose.[15] It was thus invalid under the Contract Clause.

This standard for legislation impairing contracts —that the impairment be on reasonable conditions appropriately tailored to the public purpose giving rise to the legislation—has been further clarified in later decisions. Thus, the existence of an emergency and the temporary nature of the legislation, key elements in *Blaisdell,* are not essential preconditions but are, rather, factors to be used in assessing the reasonableness of the legislative impair-

[11] *Id.,* p 434.

[12] *W B Worthen Co v Kavanaugh,* 295 US 56; 55 S Ct 555; 79 L Ed 1298 (1935).

[13] *Id.,* p 62.

[14] *Treigle v Acme Homestead Ass'n,* 297 US 189; 56 S Ct 408; 80 L Ed 575 (1936).

[15] *Cf., Veix v Sixth Ward Building & Loan Ass'n of Newark,* 310 US 32; 60 S Ct 792; 84 L Ed 1061 (1940), holding a similar law valid under the Contract Clause and distinguishing *Treigle* by finding a public purpose in controlling withdrawals that threatened the state's credit system.

ment of contracts. *United States Trust Co of New York v New Jersey;*[16] *Veix v Sixth Ward Building & Loan Ass'n.*[17] Other factors include the substantiality of the affected contractual term as an inducement to enter the contract, *El Paso v Simmons;*[18] the degree to which the legislation is in response to circumstances unforeseen at the time of contracting and limits a party to his reasonable expectations, *El Paso, supra;*[19] and whether the altered contractual term was originally based on a statute when the contract was entered. *Veix, supra.*[20]

## II

Turning to the present cases, we recognize that courts normally accord considerable deference to legislative assessments of the reasonableness and necessity of economic and social legislation. However, where such legislation impairs contractual obligations, this deference must be harmonized with the court's duty to apply the constitutional prohibition. In considering the factors outlined above, this Court will follow the lead of the United States Supreme Court in *Allied Structural Steel Co v Spannaus,*[21] in keying the degree of deference to the severity of the contractual impairment:

"The severity of the impairment measures the height

---

[16] *United States Trust Co of New York v New Jersey,* 431 US 1, 22-23, fn 19; 97 S Ct 1505; 52 L Ed 2d 92 (1977).

[17] *Veix v Sixth Ward Building & Loan Ass'n of Newark,* 310 US 32; 60 S Ct 792; 84 L Ed 1061 (1940).

[18] *El Paso v Simmons,* 379 US 497, 514; 85 S Ct 577; 13 L Ed 2d 446 (1965).

[19] *Id.,* p 515.

[20] *Veix, supra,* p 38.

[21] *Allied Structural Steel Co v Spannaus,* 438 US 234; 98 S Ct 2716; 57 L Ed 2d 727 (1978), *reh den* 439 US 886 (1978).

of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation."[22]

Our first task, therefore, is to assess the severity of the impairment. The Chief Justice limits the impairment to the new obligation to do one of the specified acts or to record a claim of interest every 20 years to preserve the interest. In so doing, she separates the obligation from the consequences of the failure to meet the new obligation, *i.e.*, forfeiture of the interest. This separation we cannot accept. Had the obligation to re-record already been law, and the Legislature acted to change the consequences from a small fine to total forfeiture, could we disregard that alteration when challenged under the Contract Clause? We suggest that we could not. Further, the approach of the Chief Justice is inconsistent with that of the United States Supreme Court. For example, in *Home Building & Loan Ass'n v Blaisdell*, 290 US 398; 54 S Ct 231; 78 L Ed 413 (1934), the mortgage moratorium legislation did not alter the mortgage *obligation*—the principal was still due and interest thereon continued to accumulate.[23] What was altered was the *consequences* of the failure to meet the mortgage obligation, namely the foreclosure procedure.

When the impairment in the present case is seen as both the obligation and its consequences, the extreme severity of the impairment is clear. The act does not merely modify the owner's interest, it adds a term providing for its extinguish-

22 *Id.,* p 245.
23 *Blaisdell, supra,* p 445.

ment. It is difficult, if not impossible, to imagine a greater impairment than one which can operate to void the contract entirely.

While it may be true, as the Chief Justice maintains, that the defendants were not substantially induced to obtain their interests in reliance on the fact that their interests need not be re-recorded, other reliance interests are at stake. Defendants identify three such interests. First is "that title to property will not be disturbed in the absence of a competing claim of title or possession", citing *Groesbeck v Seeley.*[24] Second is the expectation that if one's title is challenged or threatened, one will have notice of that challenge. Third is the basic reliance interest embodied in the Clause itself— that the state will not act to impair, and certainly not to void, lawful contracts.

It is useful to compare the impairment of these reliance interests with the impairment found to be severe in *Spannaus.* There the Minnesota Private Pension Benefits Protection Act[25] retroactively imposed vesting and funding requirements on certain employers' pension plans. The Court found the impairment severe because the additional, sudden contribution obligation "impose[d] a completely unexpected liability in potentially disabling amounts".[26]

Here, as in *Spannaus,* the impairment was unexpected, given the reliance interests noted above. Further, the contract here is threatened not merely by potential destruction, as was the pension plan in *Spannaus,* but with the certainty of extinction. The severity of this impairment clearly

---

[24] *Groesbeck v Seeley,* 13 Mich 329, 343 (1865).

[25] Minn Stat Ann §§ 181B.01-181B.17.

[26] *Spannaus, supra,* p 247.

pushes our inquiry "to a careful examination of the nature and purpose of the state legislation".[27]

The act has the purpose of encouraging development of oil and gas resources by terminating the ownership interests of inaccessible owners—ones who cannot be found—and vesting ownership in the surface owner. The presence of unknown or unlocatable owners precludes contracts for exploration or development of the oil and gas resources.

We recognize the public purpose behind the legislation, and the fact that encouraging energy development promotes a basic interest of society, rather than of a narrow group.[28] However, we are convinced that, given the severity of the impairment and the lack of reasonable conditions appropriately tailoring the impairment to the public purpose, the balance in these cases must be struck on the side of the Constitution.

First, the act needlessly fails to limit its impact to contracts within its rationale. Termination of the interests of inaccessible owners is reasonable and appropriate to its purposes, but terminating those of owners who can be located by reasonable diligence is not. The act, however, makes no effort to distinguish the two groups.[29] This overinclusiveness is analogous to the failure to condition mort-

[27] *Id.,* p 245.

[28] *Cf., Spannaus, supra,* pp 247-249; *Blaisdell, supra,* p 445.

[29] Nor can the permanent, irrebuttable presumption of abandonment called for in the act be justified. It is the nature of sub-surface interests to lie quiet, without apparent activity or assertions of ownership, until cause for exploration arises. Further, the initiative for action normally lies with the development concern, not the owner. The equating of lack of activity on the part of the owner with abandonment is simply not in accordance with common experience, much less "necessarily or universally true". *Vlandis v Kline,* 412 US 441, 452; 93 S Ct 2230; 37 L Ed 2d 63 (1973). Since the act purports to deal exclusively in terms of abandonment, this case is "squarely within *Vlandis [supra]* as limited by *[Weinberger v] Salfi* [422 US 749; 95 S Ct 2457; 45 L Ed 522 (1975)]". *Elkins v Moreno,* 435 US 647, 660; 98 S Ct 1338; 55 L Ed 2d 614 (1978).

gage relief upon a showing of necessity in *W B Worthen Co v Kavanaugh, supra,* one factor found to distinguish *Kavanaugh* from *Blaisdell.*[30]

Second, the act's purpose can be achieved by measures short of total forfeiture. A statutory royalty rate might be established, and the owner who fails to make the requisite filings may have a mineral lease at that rate imposed upon him with proceeds to be paid into a custodial trust account. As stated in *United States Trust Co v New Jersey, supra,*[31] in the context of weighing the presence of less drastic impairments, "a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well".

We wish to emphasize that we are not attempting to confine the Legislature to these alternatives, nor are we expressing any opinion on the constitutionality of these lesser impairments. We simply cannot ignore the striking absence of any effort to protect the owner's interests under the present scheme. No effort to locate the present owner is called for. No process to notify the owner of the threat to his title is provided. No effort is made to preserve the owner's interest in at least the proceeds of the development. It is this failure to condition the impairment to what is reasonable and necessary to achieve the admittedly valid public purpose of the act that renders it an unconstitutional impairment of contract.

### III

While, as a general rule, an unconstitutional

[30] *W B Worthen Co v Kavanaugh, supra,* p 63. See also *W B Worthen Co v Thomas, supra,* p 434.

[31] *United States Trust Co of New York v New Jersey,* 431 US 1, 31; 97 S Ct 1505; 52 L Ed 2d 92 (1977).

statute is void *ab initio*[32] and thus contracts based thereon create no rights or obligations, we agree with the statement in *Chicot County Drainage Dist v Baxter State Bank*[33] that "an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified".

"The actual existence of a statute, prior to * * * a determination [of unconstitutionality], is an operative fact and may have consequences which cannot be ignored."[34]

Here we deal with a statute enacted 17 years ago. Leases may have been entered and costly exploration and development may have been made in reliance on statutory forfeitures dating back 14 years. Such reliance would have been in direct furtherance of the basic legislative goal—development of energy resources. We feel that such good-faith reliance on a presumptively valid statute, in furtherance of the legislative goal, should not be upset by rigid application of retrospective invalidity.

Therefore, where a development concern has entered a lease with a surface owner in reliance on a forfeiture under the act, the lessee's rights under the lease should not be voided unless action in reliance on the lease has been minimal. However, future payments under the lease to the surface owner, rather than to the rightful owner of the sub-surface interest, cannot be justified. The rights to past payments will depend upon a balancing of the equities involved. Thus it follows that in

[32] *Stanton v Lloyd Hammond Produce Farms,* 400 Mich 135; 253 NW2d 114 (1977).

[33] *Chicot County Drainage Dist v Baxter State Bank,* 308 US 371, 374; 60 S Ct 317; 84 L Ed 329 (1940).

[34] *Id.*

*Van Slooten,* where the leases have been executed by the sub-surface owners, the leases should not be upset by the surface owner claiming under the unconstitutional statute.

Where different development concerns have entered competing leases, as in *Bickel*—one with the surface owners and the other with the sub-surface owners—the situation is more difficult. The trial court should assess the equities in light of the differing degrees of action in reliance on the leases and, where the equities are close, give effect to the normal rule of retroactive invalidity.

I would reverse the judgment of the Court of Appeals in *Van Slooten* and affirm in *Bickel.*

KAVANAGH and WILLIAMS, JJ., concurred with LEVIN, J.